JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| CHERYL JESSEN | MODEL N, INC. |

| (b) County of Residence of First Listed Plaintiff BURLINGTON | County of Residence of First Listed Defendant San Mateo |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Katherine C. Oeltjen , Esquire Console Mattiacci Law LLC, 110 Marter Avenue, Suite 502 Moorestown, NJ 08057 856-854-4000 | |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | **LABOR** | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | | | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [x] 442 Employment | [ ] 510 Motions to Vacate Sentence | | | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | **FEDERAL TAX SUITS** | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 462 Naturalization Application | | |
| | | [ ] 550 Civil Rights | [ ] 465 Other Immigration Actions | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 2000(e), et seq. ("Title VII"); N.J.S.A. § 10:5-1, et seq. ("NJLAD")

Brief description of cause:
Plaintiff brings this action against her former employer for sex discrimination.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ excess of $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| February 16, 2023 | *Katherine C. Oeltjen* |

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **CHERYL JESSEN**<br>**Lumberton, NJ 08048,**<br><br>      **Plaintiff,**<br> **v.**<br><br>**MODEL N, INC.,**<br>**777 Mariners Island Blvd**<br>**Suite 300**<br>**San Mateo, CA 94404**<br><br>      **Defendant.** | **CIVIL ACTION NO.:**<br><br>**COMPLAINT AND JURY TRIAL**<br>**DEMAND** |

## COMPLAINT

### I. INTRODUCTION

Plaintiff, Cheryl Jessen ("Plaintiff"), brings this action against Defendant, Model N, Inc. ("Defendant") pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), et seq. ("Title VII"); and the New Jersey Law Against Discrimination, as amended, N.J.S.A. § 10:5-1, et seq. ("NJLAD"),

### II. PARTIES

1. Plaintiff, Cheryl Jessen, is an individual and a citizen of the State of New Jersey. She resides in Lumberton, NJ 08048.

2. At all times material hereto, Plaintiff worked out of her home in Lumberton, NJ.

3. Defendant Model N, Inc. is a Delaware Corporation headquartered at 777 Mariners Island Boulevard, Suite 300, San Mateo, CA 94404.

4. Defendant is engaged in an industry affecting interstate commerce and regularly does business in the state of New Jersey.

5.  At all times material hereto, Defendant employed more than fifteen (15) employees.

6.  At all times material hereto, Defendant acted by and through their authorized agents, servants, workmen, and/or employees acting within the course and scope of their employment with Defendant and in furtherance of Defendant's business.

7.  At all times material hereto, Defendant acted as an employer within the meaning of the statutes which form the basis of this matter.

8.  At all times material hereto, Plaintiff was an employee of Defendant within the meaning of the statutes which form the basis of this matter.

III.  **JURISDICTION AND VENUE**

9.  The causes of action which form the basis of this matter arise under Title VII and the NJLAD.

10. The District Court has jurisdiction over Count I (Title VII) pursuant to 42 U.S.C. § 2000(e), et seq.

11. The District Court has jurisdiction over all counts pursuant to 28 U.S.C. §1332 since the amount in controversy in the present action exceeds the sum or value of seventy-five thousand dollars ($75,000), exclusive of interests and costs, and there exists complete diversity of citizenship, as Plaintiff is a citizen of the state of New Jersey and Defendant is not a citizen of the state of New Jersey.

12. The District Court has jurisdiction over Count II (NJLAD) pursuant to 28 U.S.C. § 1367.

13. Venue is proper in the District Court under 28 U.S.C. §1391(b).

14. On or about April 21, 2022, Plaintiff filed a Charge of Discrimination with the Equal

Employment Opportunity Commission ("EEOC"), complaining of the acts of discrimination and retaliation alleged herein.  Attached hereto and incorporated herein and marked as Exhibit "1" is a true and correct copy of the EEOC Charge of Discrimination (with personal identifying information redacted).

15. On or about December 6, 2022, the EEOC issued to Plaintiff a Dismissal and Notice of Rights for Plaintiff's EEOC Charge.  Attached hereto and marked as Exhibit "2" is a true and correct copy of that notice (with personal identifying information redacted).

16. Plaintiff has fully complied with all administrative prerequisites for the commencement of this action.

## IV.    FACTUAL ALLEGATIONS

17. Plaintiff worked at Defendant from in or about March 2011 through in or around December 2014.  Defendant rehired her in around February 2017.

18. At the time of Plaintiff's separation from employment, effective March 1, 2022, she had approximately nine (9) years of service with Defendant.

19. When Defendant rehired Plaintiff in around February 2017, she was placed into the position of Global Account Director, reporting to Todd Shytle ("Shytle") (male), Vice President of Sales.  Shytle reported to Russ Mellott ("Mellott") (male), Senior Vice President and Chief Revenue Officer, who reported directly to Zack Rinat ("Rinat") (male), Chief Executive Officer.

20.    In or around mid-2018, Jason Blessing ("Blessing") (male) replaced Rinat as Chief Executive Officer.

21.    In or around April 2019, Defendant hired Chris Lyon ("Lyon")(male) into the position of Senior Vice President and Chief Revenue Officer.  Lyon reported directly to Blessing.

22. When Lyon was hired, Shytle reported directly to him.

23. At all times material hereto, Plaintiff consistently demonstrated highly competent performance.  By way of example only, Plaintiff won Defendant's Sales Performer of the Year Award for 2019.

24. During Plaintiff's employment, Defendant demonstrated a bias against female employees, including Plaintiff, and subjected her to sex discriminatory conduct, including that which is set forth herein.

25. Plaintiff repeatedly expressed interest in advancing her career at Defendant, including, specifically, being promoted into a Vice President position.

26. In or around October 2019, when Lyon and Blessing discussed in a meeting that they would need someone on the sales team to take on additional and increased responsibilities, Plaintiff expressed interest and again informed Defendant that she wanted to advance her career at Defendant, including being promoted into a Vice President position.

27.    In around November 2019, Defendant hired Brian Mullen ("Mullen") (male) into the position of Vice President, Strategic Accounts.  Mullen reported directly to Lyon.

28. Defendant did not post the position of Vice President, Strategic Accounts.

29. Plaintiff was qualified for the position of Vice President, Strategic Accounts.

30. To Plaintiff's knowledge and belief, Defendant did not consider her for the open position of Vice President, Strategic Accounts into which Mullen was hired.

31. No one at Defendant spoke to Plaintiff about the open position of Vice President, Strategic Accounts into which Mullen was hired before he was hired to fill the position.

32. After Mullen was hired, Plaintiff started reporting directly to him.

33. In around January 2020, Lyon told Plaintiff that Defendant would promote her in

November 2020.

34. Lyon told Plaintiff that Mullen did not understand the business as well as she did, and that Defendant needed her to help Mullen and to lead the sales team to close the most challenging accounts.

35. In or around July 2020, Lyon told Plaintiff that her promotion had been approved.

36. In around August 2020, Mullen told Plaintiff that she would be his counterpart after she was promoted, and that they would split management of the accounts and build the business together.

37. In early November 2020, Mullen told Plaintiff to draft a document setting forth the details of her position once she was promoted.

38. Plaintiff sent Mullen a document regarding the promotion that she had been promised, including that her new title should be Vice President of Sales East, and that Mullen should be Vice President of Sales West, pursuant to his discussion with her.

39. On or about November 20, 2020, Defendant told Plaintiff that she was being promoted.

40. Defendant told Plaintiff that her new title was Regional Sales Director.

41. When Plaintiff became Regional Sales Director, her job duties increased such that she had the same job duties and responsibilities as Vice President Mullen.

42. As Regional Sales Director, Plaintiff continued to report directly to Mullen.

43. No one at Defendant told Plaintiff why she was not promoted into a Vice President position.

44. After Plaintiff became Regional Sales Director, Lyon told her that she would eventually be promoted to Vice President.

45. In or about November 2020, Defendant hired a male Strategic Account Executive, and assigned him to report directly to Plaintiff.

46. Defendant assigned the male Strategic Account Executive to manage an account that Plaintiff had recently secured for Defendant.

47. As a result of Defendant's assignment of Plaintiff's account to the male Strategic Account Executive, and to Plaintiff's knowledge and belief, he received more compensation from the account than Plaintiff did.

48. In or around December 2020, Plaintiff complained to Defendant that she was being discriminated against based on her sex, including Defendant's failure to promote her into a Vice President position, especially given the duties and responsibilities that she had been handling as Regional Sales Director.

49.    Angie Yi ("Yi"), Human Resources Business Partner, told Plaintiff that she had fought for Plaintiff to be promoted into a Vice President role, but that Lyon had made the final decision to maintain Plaintiff's director-level position.

50. Yi told Plaintiff that she should discuss her complaints with Mullen.

51. Plaintiff complained, repeatedly, to Mullen about Defendant's failure to promote her into a Vice President position, including that she was not being treated fairly based on her increase in job duties and responsibilities.

52. To Plaintiff's information and belief, Defendant failed to take appropriate remedial and/or corrective action regarding her complaint of sex discrimination.

53. On or about January 6, 2021, Defendant gave Plaintiff her compensation plan for her Regional Sales Director position into which she had been placed, and had been working, since November 2020.

54.    In or around January 2021, Plaintiff complained to Benjamin Loeffler-Little ("Loeffler-Little), Vice President, Sales Strategy, Operations and Enablement about the disparity in treatment between her and Mullen in connection with her increased responsibilities as Regional Sales Director and in connection with the male Strategic Account Executive earning more than her as a result of the account that she had brought in to Defendant.

55. Loeffler-Little told Plaintiff that he would talk to Lyon about her complaints.

56. Shortly thereafter, Plaintiff met with Lyon and Mullen during which she was told that, as a manager, she had to be willing to give things up for the team.

57. In or around January 2021, Plaintiff took on the responsibility of securing a new account that was not within the scope of her Regional Sales Director job.

58. Despite Plaintiff successfully securing the account on behalf of Defendant, she was not compensated in accordance with her work or the volume of the business that she had brought into Defendant.

59. In early 2021, Plaintiff, again, complained to Defendant about the sex discrimination to which she was being subjected.

60. Defendant failed to take appropriate remedial and/or corrective action regarding Plaintiff's complaints of discrimination.

61. Following Plaintiff's complaints of sex discrimination, Defendant continued to discriminate against her based on her sex and also retaliated against her based on her complaints about the same, including as set forth herein.

62. During a company-wide meeting in or around July 2021, Lyon praised Mullen for the performance of the sales team that Mullen and Plaintiff managed.  Lyon also gave Mullen credit for Plaintiff's accomplishments.

63. When Plaintiff asked Lyon why he had recognized and credited Mullen for work that she had accomplished, and failed to recognize her for her accomplishments, Lyon said that it was an oversight.

64. Lyon also told Plaintiff that it was appropriate to give Mullen the credit for the team's work, as she reported directly to Mullen.

65. Lyon told Plaintiff that Defendant would promote her into a Vice President position soon, that she was a leader at Defendant, that she was doing an amazing job, and that he would give her more restricted stock units soon.

66. In or around September 2021, Plaintiff learned that Mullen and Loeffler-Little were excluding her from meetings about seeking new territories and sales opportunities.

67. When Plaintiff complained to Mullen about being excluded from discussions about potential sales opportunities for their group, he told her that it was an oversight.

68. When Plaintiff complained to Mullen about the disparities between the way that Defendant treated her and the way that Defendant treated him, he agreed and told her that he would speak with Lyon about the same.

69. Lyon did not get back to Plaintiff about her complaints.

70.    On or about October 15, 2021, Plaintiff complained to Maria Cammarosano ("Cammarosano"), Human Resources, about Defendant's sex discriminatory conduct.

71. When Cammarosano asked Plaintiff if she felt that Lyon treated her differently because she was a woman, Plaintiff responded that she did.

72. In connection with Plaintiff's complaint of discrimination to Cammarosano, Plaintiff told her that Defendant's sex discriminatory conduct included:

(a) Failing to promote her into the position of Vice President;

(b) Compensating her differently, and worse, than male employees; and,

(c) Taking on the same job duties and responsibilities as Mullen while remaining his subordinate and holding a lesser title.

73.     On or about October 16, 2021, Plaintiff complained to Sophia Dorry ("Dorry"), Human Resources, about Defendant's sex discriminatory conduct.

74. In connection with Plaintiff's complaint of discrimination to Dorry, Plaintiff told her that Defendant's sex discriminatory conduct included:

(a)     Failing to promote her into the position of Vice President;

(b)     Compensating her differently, and worse, than male employees;

(c)     Taking on the same job duties and responsibilities as Mullen while remaining his subordinate and holding a lesser title; and,

(d)     The male Strategic Account Executive receiving a higher payout than her in connection with the account that she had closed.

75. On or about November 12, 2021, Lyon told Plaintiff that he heard that she was unhappy.

76. Lyon told Plaintiff that he did not understand why she thought that she was going to be Mullen's equal, at a Vice President level.

77. Plaintiff told Lyon that her title, her compensation, and her reporting structure should be the same as Mullen's as they had the same role and responsibilities.

78. Lyon confirmed with Plaintiff that she had the same role as Mullen.

79. Lyon also confirmed with Plaintiff that he considered her to be a leader at Defendant and that he was happy with her performance.

80. Lyon told Plaintiff that he wanted to think about some things and that he would get back to her.

81. On or about November 15, 2021, Lyon told Plaintiff that Defendant was offering her

a position on the Senior Leadership Team and that Defendant was making an exception for her, as generally only Vice Presidents were allowed on the Leadership Team.

82. On or about November 23, 2021, Mullen and Dorry met with Plaintiff.

83. In the meeting, Mullen told Plaintiff that nothing was going to change regarding the terms and conditions of her employment in the following year.

84. Mullen also told Plaintiff that Dorry would explain what Plaintiff needed to do in order to be promoted to a Vice President position.

85. Mullen and Dorry told Plaintiff that she could not be promoted to a Vice President position until she had a high-performing sales team.

86. Plaintiff reminded Mullen and Dorry that her sales team was performing well despite the fact that Mullen had retained for his team the most experienced sales managers.

87. On or about November 24, 2021, Defendant gave Plaintiff a compensation plan for the following year.  The same included an increase in her quota by approximately sixty (60%) and a decrease in her payout percentages.

88. The changes to Plaintiff's compensation plan made it more difficult for her to maintain her then-current level of compensation, let alone to earn more commissions based on sales.

89. In or around December 2021, Mullen and Dorry told Plaintiff that it seemed as though she was not in a good place.

90. Plaintiff again complained that she had the same duties and responsibilities as Mullen, and was performing as well or better than him, but that she did not have the elevated title or compensation that he had.

91. Plaintiff also complained that Defendant continued to fail to promote her into the

Vice President position and that it did not provide her with specific requirements or criteria to be promoted into the Vice President position.

92. Mullen told Plaintiff that she met all of the criteria for the Vice President role except that she had not built an exceptional sales team.

93. Plaintiff told Mullen that she had still managed to perform well with her team despite the fact that he had retained for his team the more experienced sales managers.

94. On or about February 15, 2022, Plaintiff resigned from her employment with Defendant, effective March 1, 2022.

95. Mullen told Plaintiff to tell Defendant's Human Resources that Lyon had made the poor decisions in connection with her treatment.

96. On or about February 15, 2022, Plaintiff met with Laura Selig ("Selig"), Defendant's Chief Human Resources Officer, and informed her that she had resigned her employment.

97. When Selig asked Plaintiff why she resigned, Plaintiff told she had been subjected to sex discrimination and had complained about the same.

98. Selig told Plaintiff that she was aware of the situation, believed that Defendant had not handled it well, and that it was a scar on the company. Selig also told Plaintiff that Defendant was aware that there were issues in connection with Lyon.

99. Plaintiff told Selig that Defendant had multiple chances to make things right for her, that it had not, that, instead, it had retaliated against her, and that she did not feel that she had any other options but to separate from her employment.

100. As of the time of Plaintiff's separation from employment, no one from Defendant

11

told her about remedial and/or corrective action that it had taken in connection with her complaints of sex discrimination, including conducting an investigation into her complaints.

101.   Defendant's demographics evidenced a bias towards female employees.  By way of example only, during Plaintiff's employment, there was only one woman on Defendant's Leadership Team.  By way of further example, Defendant's second-level of management was dominated by males.

102.   During Plaintiff's employment with Defendant, she was told by other female managers that they believed that the environment at Defendant was one of an "old boys' club".

103.   Plaintiff was told by a female manager at Defendant that she believed that Plaintiff had not been treated fairly because she was a woman.

104.   Plaintiff was told by a female manager that Lyon did not want women in Vice President or Leadership Team positions at Defendant.

105.   Plaintiff's sex was a motivating and/or determinative factor in Defendant's discriminatory treatment of Plaintiff, including the hostile work environment to which Plaintiff was subjected, Defendant's failure to promote Plaintiff, Plaintiff's compensation, and the separation of Plaintiff's employment.

106.   Plaintiff's complaining of sex discrimination was a motivating and/or determinative factor in Defendant's retaliatory treatment of Plaintiff, including the hostile work environment to which Plaintiff was subjected, Defendant's failure to promote Plaintiff, Plaintiff's compensation, and the separation of Plaintiff's employment.

107.   Defendant failed to prevent or address the discriminatory and retaliatory conduct referred to herein and further failed to take corrective and remedial measures to make the workplace free of discriminatory and retaliatory conduct.

108.    The retaliatory actions taken against Plaintiff after she complained of discriminatory conduct would have discouraged a reasonable employee from complaining of discrimination.

109.    The discriminatory and retaliatory conduct of Defendant, as alleged herein, was severe and/or pervasive enough to make a reasonable person believe that the conditions of employment had been altered and that a hostile work environment existed, and made Plaintiff believe that the conditions of employment had been altered and that a hostile work environment existed.

110.    As a direct and proximate result of the discriminatory and retaliatory conduct of Defendant, Plaintiff has in the past incurred, and may in the future incur, a loss of earnings and/or earning capacity, loss of benefits, pain and suffering, embarrassment, humiliation, loss of self-esteem, mental anguish, and loss of life's pleasures, the full extent of which is not known at this time.

111.    Defendant acted with malice and/or reckless indifference to Plaintiff's protected rights.

## **COUNT I – TITLE VII**

112.    Plaintiff incorporates herein by reference paragraphs 1 through 111 above, as if set forth herein in their entirety.

113.    By committing the foregoing acts of discrimination and retaliation against Plaintiff, Defendant has violated Title VII.

114.    Defendant acted intentionally, and with malice and/or reckless indifference to Plaintiff's rights, and its conduct warrants the imposition of punitive damages.

115.    As a direct and proximate result of Defendant's violation of Title VII, Plaintiff has suffered the damages and losses set forth herein and has incurred attorney's fees and costs.

116.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory and retaliatory acts unless and until this Court grants the relief requested herein.

117.    No previous application has been made for the relief requested herein.

## COUNT II – NJLAD

118.    Plaintiff incorporates herein by reference paragraphs 1 through 117 above, as if set forth herein in their entirety.

119.    Defendant, by the above improper and discriminatory and retaliatory acts, has violated the NJLAD.

120.    Said violations were intentional and willful.

121.    As a direct and proximate result of Defendant's violation of the NJLAD, Plaintiff has sustained the injuries, damages, and losses set forth herein and has incurred attorney's fees and costs.

122.    Plaintiff is now suffering and will continue to suffer irreparable injuries and monetary damages as a result of Defendant's discriminatory and retaliatory acts unless and until the Court grants the relief requested herein.

123.    No previous application has been made for the relief requested herein.

## **RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendant:

(a) declaring the acts and practices complained of herein to be a violation of the Title VII;

(b) declaring the acts and practices complained of herein to be in violation of the NJLAD;

(c) entering judgment against Defendant and in favor of Plaintiff in an amount to be determined;

(d)    enjoining and restraining permanently the violations alleged herein;

(e)    awarding compensatory damages to Plaintiff to make Plaintiff whole for all past and future lost earnings, benefits, and earning capacity, which Plaintiff has suffered and will continue to suffer as a result of Defendant's discriminatory, retaliatory, and unlawful misconduct;

(f)    awarding compensatory damages to Plaintiff for past and future emotional upset, mental anguish, humiliation, loss of life's pleasures, and pain and suffering;

(g)    awarding Plaintiff costs of this action, together with reasonable attorney's fees;

(h)    awarding punitive damages to Plaintiff;

(i)    awarding Plaintiff such other damages as are appropriate under Title VII and the NJLAD; and

(j)     granting such other and further relief as this Court deems appropriate.


                                    **CONSOLE MATTIACCI LAW, LLC**

Dated: February 16, 2023            BY:     */s/ Katherine C. Oeltjen*
                                            Katherine C. Oeltjen (57372013)
                                            **CONSOLE MATTIACCI LAW LLC**
                                            110 Marter Avenue, Suite 502
                                            Moorestown, NJ 08057
                                            Telephone: (856) 854-4000
                                            Facsimile: (215) 565-2852

                                            *Attorney for Plaintiff Cheryl Jessen*

# EXHIBIT 1

| **CHARGE OF DISCRIMINATION** | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See privacy statement before consolidating this form. | Q  FEPA<br>X  EEOC | |

| STATE OR LOCAL AGENCY: | | |
|---|---|---|

| NAME (Indicate Mr., **Ms.**, Mrs.)<br>**Cheryl Jessen** | HOME TELEPHONE NUMBER *(Include Area Code)*<br>REDACTED |
|---|---|

| STREET ADDRESS<br>REDACTED | CITY, STATE AND ZIP<br>Lumberton, NJ 08048 | DATE OF BIRTH<br>REDACTED |
|---|---|---|

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP, COMMITTEE, STATE OF LOCAL GOVERNMENT WHO DISCRIMINATED AGAINST ME (If more than one than list below)

| NAME<br>Model N, Inc. | NUMBER OF EMPLOYEES, MEMBERS<br>> 500 | TELEPHONE (Include Area Code)<br>(650) 610-4800 |
|---|---|---|
| STREET ADDRESS<br>777 Mariners Island Blvd, Suite 300 | CITY, STATE AND ZIP<br>San Mateo, CA 94404 | COUNTY<br>San Mateo County |

| CAUSE OF DISCRIMINATION *(Check appropriate box(es))*<br>Q Race  Q Color  **X Sex**  Q Religion  Q National Origin<br>**X** Retaliation  Q Age  Q Disability  Q Other *(Specify)* | DATE DISCRIMINATION TOOK PLACE<br><br>*Earliest*          *Latest*  03/01/2022 |
|---|---|

**The Particulars Are:**

A.    1.      Relevant Work History

I was first hired by Respondent in or about March 2011. I last held the position of Regional Sales Director. I last reported to Brian Mullen (male), Vice President, Strategic Accounts. Mullen reported to Christopher Lyon (male), Chief Revenue Officer. Lyon reported to Jason Blessing (male), Chief Executive Officer. I worked out of my home office in New Jersey.

Respondent subjected me to a hostile work environment, failed to promote me, and failed to compensate me as much as male employees because of my sex. After I complained of sex discrimination, Respondent failed to promote me, treated me in a more hostile and dismissive manner, and failed to remedy or prevent the sex discrimination and retaliation to which I was subjected. I resigned from Respondent because of the sex discrimination and retaliation to which I was subjected, and because of Respondent's failure to remedy or prevent the sex discrimination and retaliation to which I was subjected.

I consistently demonstrated positive performance and dedication to Respondent. I performed my duties in a highly-competent manner.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures | NOTARY - (when necessary for State and Local Requirements) |
|---|---|
| | I swear of affirm that I have read the above charge and that it is true to the best of my knowledge information and belief. |
| I declare under penalty or perjury that the foregoing is true and correct. | |

| Date:  4/21/2022      Charging Party *(Signature)*:<br><br>*Cheryl Jessen* | SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day Month, and year) |
|---|---|

**EEOC Charge of Discrimination**
**Initials of Charging Party – CM**

2.   Harm Summary

I have been discriminated against because of my sex (female), and retaliated against because of my sex discrimination complaints. Evidence of the discriminatory and retaliatory conduct to which I have been subjected includes, but is not limited to, the following.

(a)   Respondent has an underrepresentation of female employees, especially in high-level positions.

(b)   Out of Respondent's six (6) Vice President employees reporting to Lyon, only one (1) is female.

(c)   Male employees treated female employees, including me, differently and worse, and in a more hostile and dismissive manner, than male employees were treated.

(d)   In or about April 2019, I began indirectly reporting to Lyon.

(e)   Lyon had no role in my being hired at Respondent.

(f)   Before holding the Regional Sales Director position, I held a Global Account Director position.

(g)   I repeatedly expressed my interest in being promoted, specifically to a Vice President position, and advancing my career at Respondent.

(h)   In or about October 2019, in a meeting with Lyon and Blessing at a Sales Club meeting where I won Sales Performer of the Year, they discussed that, due to Respondent's growth, they would need someone else on the team to take on responsibilities. I expressed my interest in the position, and reiterated my interest in being promoted, specifically to a Vice President position, and advancing my career at Respondent.

(i)   In November 2019, Respondent failed to promote me to Vice President, Strategic Accounts. Instead of promoting me, Respondent hired Mullen (male). I was more qualified for the position than the external male employee that Respondent hired. I had no opportunity to apply for the position as it was not posted. If the position had been posted, I would have applied for it.

(j)   In November 2019, following the above, I began reporting to Mullen.

(k)   Mullen had no role in my being hired at Respondent.

(l)   In January 2020, in a meeting with Lyon, he stated that he wanted to promote me in November 2020, and that he was putting my promoted position in the budget. He stated that Mullen did not understand the business as well as I did. He told me that he needed me to help Mullen and lead the team to close the most challenging accounts. He stated that it would be a big opportunity for me.

(m)   In or about July 2020, Lyon told me that my promotion was approved by Blessing and the finance team.

(n)   In or about August 2020, in a meeting with Mullen, he stated that, in my promoted position, I would be his counterpart. He stated that we would split the accounts and build the business together.

(o)   On November 4, 2020, in a phone call with Mullen, he instructed me to prepare a

2

document that included what I wanted my new position to look like.

(p)  On November 6, 2020, in an email to Mullen, I sent him the document that I prepared regarding my new position, as requested. The document proposed that my title would be Vice President of Sales East, and Mullen's title would be Vice President of Sales West.

(q)  I received no response to my above email and document.

(r)  On November 20, 2020, in an email from Mullen, Respondent failed to promote me to Vice President. Instead of promoting me to Vice President, Respondent promoted me Regional Sales Director.

(s)  On November 23, 2020, in a phone call from Mullen, I told him that I was disappointed by three (3) things regarding the promotion: the title was not right for the job, as it should have been a Vice President position and not a Director level position; the compensation increase was not sufficient for the increase in responsibilities and direct reports that I would have; and the restricted stock units were lacking, as Respondent's new hires were given significantly more than I was being offered. Mullen stated that the forthcoming compensation plan would make up for the shortfalls I referenced, that this was a great opportunity for me, and that the position was being treated like a big role. Mullen stated that I would have the compensation plan soon and that I would be happy with it.

(t)  As Regional Sales Director, I was doing the same job duties and responsibilities as Mullen but remained reporting to him, was compensated less than him, and had a lesser title than him.

(u)  I received no explanation, including the criteria, as to why I was not given a Vice President title, not given the same compensation as Mullen, and not reporting to Lyon.

(v)  Following the above, in a conversation with Lyon, he told me that I would eventually be promoted to Vice President and would then have better incentives, bonus payouts, and stock options for my efforts.

(w)  In or about November 2020, Respondent hired Lewis Larrabee (male), Strategic Account Executive, who was assigned to report to me.

(x)  Following the above, Respondent gave an account that I had recently closed to Larrabee. Larrabee received a significantly higher payout that I received from the account that I had closed and from which I only received a small fraction.

(y)  In December 2020, in a meeting with Angie Yi (female), Human Resources Business Partner, I complained of sex discrimination. I complained that I was being treated differently and worse because I was a woman and, if I were a man, I would not be in this situation. I told her that I was disappointed by three (3) things regarding the promotion offer I received: the title was not right for the job, as it should have been a Vice President position and not a Director level position; the compensation increase was not sufficient for the increase in responsibilities and direct reports that I would have; and the restricted stock units were lacking, as Respondent's new hires were given more than I was offered. She told me that she fought for me to get the Vice President title during promotion conversations, but that Lyon made the final decision to give me the Director title. She instructed me to reach out to Mullen and discuss these issues with him.

**EEOC Charge of Discrimination**
**Initials of Charging Party –** *CV*

(z)  Respondent failed to remedy or prevent the sex discrimination and retaliation to which I was subjected.

(aa) Respondent failed to investigate my sex discrimination complaints.

(bb) In December 2020, following the above, in a meeting with Mullen, I reiterated my disappointments and concerns about the promotion.  Mullen told me to wait for the compensation plan that was still being developed.

(cc) On January 6, 2021, I received the compensation plan for my Regional Sales Director position.  The compensation that was outlined for my position was much less than anticipated and much less than male employees were compensated.

(dd) In January 2021, following the above, when I asked Mullen why my compensation plan was much less than anticipated, he told me to speak with Benjamin Loeffler-Little (male), Vice President, Sales Strategy, Operations, and Enablement.

(ee) In January 2021, following the above, in a conversation with Loeffler-Little, he stated that, if my team exceeded expectations, I would do well.  I raised the disparities in Mullen's team compared to my team, with Mullen's team being more experienced and tenured, with more lucrative accounts, than mine.  I asked why I still reported to Mullen.  I stated that Larrabee should not benefit more than me from my closing an account, especially since he had only been employed since November 2020 and I had worked on the account for years.  He stated that he would talk to Lyon.

(ff)  In or about mid-January 2021, in a meeting with Lyon and Mullen, my compensation concerns were dismissed and I was told that, as a manager, I had to be willing to give things up for the team.

(gg) In January 2021, following the above, after being asked to complete a substantial project and successfully completing it, I was paid a minimal bonus compared to what male employees were paid for completing a similar project.

(hh) My accomplishments and efforts were downplayed and not recognized, unlike male employees' accomplishments and efforts.

(ii)  In meetings with Yi, I again complained of sex discrimination in connection with how I was being treated, including Respondent's failure to promote me and failure to compensate me as much as male employees.

(jj)  On February 15, 2021, in a meeting with Mark Anderson (male), Senior Vice President of Global Services, I complained of sex discrimination.  I told him that I was doing the same job as Mullen and not being compensated what he was being compensated or given the same title as Mullen, which my role deserved.  He stated that he did not disagree with me, and it was an unfortunate situation, but Lyon and Blessing were close, and although he did not understand why Lyon and Blessing were putting me in this situation, he did not think anything would change.

(kk) Following my sex discrimination complaints, in a hostile and dismissive manner.

(ll)  In July 2021, in a town hall meeting, Lyon praised and recognized Mullen, giving him credit for work that I had completed and accomplished.

(mm)   My coworkers asked why Mullen was given the credit for my work.

(nn) In July 2021, following the above, in a phone call with Mullen, I asked why he was

4

recognized and given credit for my accomplishments, and I had not been acknowledged. Mullen did not answer my question.

(oo) In July 2021, following the above, in a phone call with Lyon, I asked why Mullen was recognized and given credit for my accomplishments and I had not been acknowledged. Lyon stated that it was an oversight. Lyon stated that I reported to Mullen, so it was appropriate to give Mullen the credit. He told me that he had too many direct reports, so that was why I was reporting to Mullen. I told Lyon that I was doing the same job as Mullen and was doing it better. Lyon promised that I would be a Vice President soon, that I was important, and that I was a leader. He told me that I was doing an amazing job and he would give me more restricted stock units soon.

(pp) In or about September 2021, I found out that Mullen and Loeffler-Little had started seeking new territories on a phone call from which I had been excluded.

(qq) In or about September 2021, following the above, I asked Mullen why he and Loeffler-Little had started looking at territories without me. I stated that I should be involved with the details of alignment for the following year. Mullen agreed and told me that it was an oversight. I objected to the continued inequalities between him and me, and stated that things needed to change. He told me he agreed with me and would speak with Lyon.

(rr) In or about September 2021, Zara Munnam (female), Regional Sales Manager, resigned from Respondent after being employed for less than one (1) year.

(ss) I heard that Munnam had complained of sex discrimination in connection with Lyon.

(tt) In or about October 2021, Respondent demoted Melonie Warfel (female), from General Manager of Sales to Vice President of Sales, Europe.

(uu) I heard that Lyon gave Warfel the option of being terminated with a severance package or being demoted.

(vv) Warfel told me that she had spoken with Laura Selig (female), Vice President of Global Human Resources, about Lyon. She stated that she was aware that I was not being treated fairly in my position because I was a woman and felt like Respondent was an "old boys' club" and things would not change.

(ww) Patricia Callahan (female), Vice President, Professional Services, told me that she felt like women were not treated fairly at Respondent and that Respondent was a "boys' club." She stated that she believed that Lyon did not want women in Vice President or Executive Leadership Team positions. She stated that they only reason that she had her title was because she threatened to quit if they did not give it to her.

(xx) On October 15, 2021, in a meeting with Maria Cammarosano (female), Human Resources, I complained of sex discrimination. She asked me if I felt that Lyon treated me differently because I was a woman. I responded yes, and I told her about my experiences, including Respondent's failure to promote me to Vice President and failure to compensate me as much as male employees. I stated that, as Regional Sales Director, I had the same job duties and responsibilities as Mullen but remained reporting to him, was compensated less than him, and had a lesser title than him. I stated that Mullen agreed with me and that I believed Lyon made those decisions.

(yy) On October 16, 2021, in a meeting with Sophia Dorry (female), Human Resources, I complained of sex discrimination. I told her about my experiences, including Respondent's failure to promote me to Vice President and failure to compensate me

as much as male employees. I stated that, as Regional Sales Director, I had the same job duties and responsibilities as Mullen but remained reporting to him, was compensated less than him, and had a lesser title than him. I stated that I believed Lyon made those decisions. I stated that Larrabee received a significantly higher payout from the account that I had closed and from which I only received a small fraction. I stated that, when I was promoted, the title was not right for the job, as it should have been a Vice President position and not a Director level position, the compensation increase was not sufficient for the increase in responsibilities and direct reports, the restricted stock units were lacking, as Respondent's new hires were given more than I was offered, and that the compensation plan for my position was much less than anticipated.

(zz) On November 12, 2021, in a phone call with Lyon, I asked why I had not been promoted to Vice President, reporting to Lyon. Lyon stated that he heard I was unhappy. He stated that he created my position as a "test" to see if I had good business sense, and that I was not his direct report because he already had twelve (12) direct reports and was "running hard." I stated that I was bringing in the bulk of the large deals, and again asked why I was not being identified and treated as a Vice President. I asked why I would continue to report to Mullen and contribute to his numbers, as that did not make sense to me. Lyon stated he did not understand why I thought I was going to be Mullen's equal, at a Vice President level. I told him that Mullen had told me that I was his counterpart, and that Mullen would take the West and I would take the East. I stated that my title, my compensation, my reporting structure, my lack of participation on the leadership team, and reduced territory were disappointing, and that each of these items should be equal to Mullen. I stated that I had previously raised these issues to Mullen and he agreed with me. I asked Lyon if I had the same role as Mullen, and he said yes. I asked Lyon if I was a leader, and he said yes. He said he felt like he was letting a friend down. Lyon apologized for the misunderstanding and stated that he was happy with my performance. He told me that he wanted to think about some things and get back to me.

(aaa)    On November 15, 2021, in a phone call with Lyon, he stated that he wanted to offer me a position on the Senior Leadership Team. He stated that it would be an honor since only Vice Presidents were allowed on the Senior Leadership Team, and they were making an exception for me since I was not a Vice President but was highly valued.

(bbb)    On November 23, 2021, in a meeting with Mullen and Dorry, Mullen told me that nothing would change for me the following year. Mullen's tone toward me was different and worse than it had been before I had complained of sex discrimination. He told me that he was aware of my conversation with Dorry, and that she was going to set up a series of meetings to answer my questions around why Mullen received credit for my team. Mullen stated that Dorry would also explain what I needed to do to be promoted to a Vice President position. He stated that Respondent did not have requirements for the Vice President position when I was promoted to Regional Sales Director, but Respondent did now. I was not given any specific criteria or requirements for what I needed to do to be promoted to Vice President. I cried during the meeting.

(ccc)    On November 24, 2021, I received my new compensation plan. My quota was increased by sixty percent (60%), and my payout percentages were decreased. My compensation was being reduced, I felt like I was being forced out.

(ddd)    In December 2021, in meetings with Mullen and Dorry, they told me that it seemed like I was not in a good place. I continued to reiterate that I was doing the same job as Mullen, even better than Mullen, but without the title or the

**EEOC Charge of Discrimination**
**Initials of Charging Party –** *CN*

compensation. No one disagreed with me or denied the same. I continued to ask to be promoted to Vice President, and stated that I did not understand why I was not being promoted. I still was not given specific criteria or requirements for what I needed to do to be promoted to Vice President. Mullen stated that I fit all the criteria for being promoted except that I had not built an exceptional sales team. I asked him how I could do that with the all-new team that he gave me compared to the tenured team that he kept. He had no response. I told him that I felt like I had been set up to fail but still pulled out a very good year.

(eee)    Despite my numerous sex discrimination complaints to members of Human Resources and officers of Respondent, dating back to December 2020, Respondent never advised me of whether it had investigated the same or reached any conclusion.

(fff) On February 15, 2022, in a meeting with Mullen, I resigned from Respondent, effective March 1, 2022. I stated that I felt retaliated against, and stated that he should not be surprised that I was resigning after all our conversations and my not being promoted to or compensated at his level. Mullen told me that he felt horrible and that I would be a huge loss. He told me to tell Human Resources that Lyon had made all the poor decisions.

(ggg)    On February 15, 2022, following the above, in a meeting with Selig, I told her that I had resigned from Respondent, effective March 1, 2022. She asked why, and I asked her if she was aware of my meetings with Human Resources regarding how I had been treated. I complained of sex discrimination, and stated that I felt like I was being treated differently and worse than Mullen. She responded that she knew about the situation, felt that it was not handled well, and believed that it was a scar on Respondent. She stated that Respondent was trying to help Lyon be a better leader and that Respondent recognized that there were issues. I stated that Respondent had many chances to make things right for me and did not, that I felt retaliated against, and that I did not feel like I had any options left but to leave.

(hhh)    I resigned from Respondent because of the sex discrimination and retaliation to which I was subjected, and because of Respondent's failure to remedy or prevent the sex discrimination and retaliation to which I was subjected.

(iii) Respondent subjected me to a hostile work environment because of my sex and/or my sex discrimination complaints.

(jjj) Respondent failed to remedy or prevent the sex discrimination and retaliation to which I and other female employees were subjected.

(kkk)    Respondent failed to promote me to Vice President because of my sex and/or sex discrimination complaints.

(lll) Respondent failed to compensate me as much as male employees, including Mullen, because of my sex and/or sex discrimination complaints.

(mmm) Respondent assigned my job duties to male and/or noncomplaining employees.

(nnn)    I had no performance or disciplinary issues throughout my employment.

(ooo)    Respondent's sex discriminatory and retaliatory conduct and comments have caused me emotional distress.

(ppp)    Respondent did not target or treat me in the same way as similarly-situated male and/or noncomplaining employees.

7

EEOC Charge of Discrimination
Initials of Charging Party – *C.J.*

B.    1.    Respondent's Stated Reasons

    (a)    Respondent has provided no explanation for subjecting me to a hostile work environment because of my sex and/or my sex discrimination complaints.

    (b)    Respondent has provided no explanation for failing to compensate me as much as male employees are compensated.

    (c)    Respondent has provided no explanation for failing to promote me to Vice President.

    (d)    Respondent has provided no explanation for failing to remedy or prevent the sex discrimination and retaliation against me.

C.    1.    Statutes and Bases for Allegations

I believe that Respondent has discriminated against me based on my sex (female), and retaliated against me based on my sex discrimination complaints in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), *et seq.* ("Title VII"); and the New Jersey Law Against Discrimination, as amended, N.J.S.A. § 10:5-1, *et seq.* ("NJLAD"), as set forth herein.

D.    1.    **Class Charge**

**I bring this Complaint as a class and pattern and practice Charge on behalf of myself and any and all current or former employees of Respondents who are female, and have been discriminated against based on sex, in connection with the terms and conditions of their employment, including being subjected to a hostile work environment, demotion, failure to promote, compensation, and/or termination.**

# EXHIBIT 2

EEOC Form 161-B (01/2022)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To:  **Cheryl Jessen**
REDACTED
**Lumberton, NJ 08048**

From:  **Philadelphia District Office**
**801 Market St, Suite 1000**
**Philadelphia, PA 19107**

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **530-2022-03959** | **Legal Unit** | **(267) 589-9707** |

*(See also the additional information enclosed with this form.)*

### NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

More than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

*Equal Pay Act (EPA): You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.*

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Digitally Signed By: Karen McDonough
12/06/2022
**Karen McDonough**
**Deputy Director**

Enclosures(s)

cc:    **Rachel Fendell Satinsky**
**Littler Mendelson, P.C.**
**1601 CHERRY ST STE 1400**
**Philadelphia, PA 19102**
**Errol Hunter**
**Model N, Inc.**
**777 MARINERS ISLAND BOULEVARD SUITE 300**
**SAN MATEO, CA 94404**

**Emily R Derstine Friesen**
**CONSOLE MATTIACCI LAW, LLC**
**1525 Locust Street, 9th Floor**
**Philadelphia, PA 19102**