[ECF No. 32]

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

**CHERYL JESSEN,**

        **Plaintiff,**

v.

**MODEL N, INC.,**

        **Defendant.**

Civil No. 23-919 (KMW/EAP)

**OPINION**

This matter comes before the Court on the Motion of Defendant Model N, Inc. seeking a Protective Order and/or to Quash Plaintiff's Notice of Deposition for Defendant's Chief Executive Officer ("CEO") Jason Blessing, ECF No. 32 ("Def.'s Motion"). Plaintiff Cheryl Jessen opposed the motion, ECF No. 35 ("Pl.'s Opp."), and Defendant Model N filed a reply, ECF No. 39 ("Def.'s Reply"). The Court has reviewed the parties' submissions and decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78(b). For the reasons that follow, Defendant's motion is **GRANTED**.

**FACTUAL BACKGROUND**

This employment discrimination case arises out of Plaintiff's former employment with Defendant Model N. *See* ECF No. 1 ("Compl."). Defendant employed Plaintiff from 2011 to 2014, and then rehired her in 2017 as a Global Account Director. *Id.* ¶¶ 17, 19. In November 2020, Defendant promoted Plaintiff to Regional Sales Director. *Id.* ¶¶ 39-40. Plaintiff resigned her position with Defendant in February 2022. *Id.* ¶¶ 18, 94.

When Defendant rehired Plaintiff in 2017 into the Global Account Director position, Plaintiff reported to Vice President of Sales Todd Shytle, who reported to Senior Vice President and Chief Revenue Officer Ross Mellott, who reported to Chief Executive Officer Zack Rinat. *Id.* ¶ 19. In 2018, Jason Blessing replaced Zack Rinat as Chief Executive Officer. *Id.* ¶ 20. In 2019, Chris Lyon replaced Russ Mellott as Senior Vice President and Chief Revenue Officer. *Id.* ¶ 21. In 2019, Defendant also hired Brian Mullen to be Vice President of Strategic Accounts, and Plaintiff began reporting directly to him. *Id.* ¶¶ 27, 32. Thus, by 2020, Plaintiff reported to VP Mullen, who reported to SVP and CRO Lyon, who reported to CEO Blessing. After Plaintiff's promotion to Regional Sales Director in November 2020, she continued to report to the same chain of command. *Id.* ¶ 42. Plaintiff alleges, however, that upon her promotion, "her job duties increased such that she had the same job duties and responsibilities as Vice President Mullen." *Id.* ¶ 41.

Around the time of Plaintiff's promotion, Defendant hired a male Strategic Account Executive, who reported directly to Plaintiff. *Id.* ¶ 45. Plaintiff alleges that Defendant assigned him "to manage an account that Plaintiff had recently secured for Defendant," and as a result, "he received more compensation from the account than Plaintiff did." *Id.* ¶¶ 45-47.

In December 2020, shortly after her promotion, Plaintiff complained to Defendant that its failure to promote her into a Vice President position amounted to sex discrimination, "especially given the duties and responsibilities that she had been handling as Regional Sales Director." *Id.* ¶ 48. Plaintiff alleges that Angie Yi, a human resources business partner at Defendant, "told Plaintiff that she had fought for Plaintiff to be promoted into a Vice President role, but that Lyon had made the final decision to maintain Plaintiff's director-level position." *Id.* ¶ 49. Plaintiff also alleges that she complained "repeatedly" to VP Mullen regarding Defendant's failure to promote her into

2

a Vice President position. *Id.* ¶ 51.  Plaintiff also alleges that she complained to Benjamin Loeffler-Little, Vice President of Sales Strategy, Operations and Enablement, "about the disparity in treatment between her and Mullen in connection with her increased responsibilities as Regional Sales Director and in connection with the male Strategic Account Executive earning more than her as a result of the account that she had brought in to Defendant." *Id.* ¶ 54.  Plaintiff contends that VP Loeffler-Little "told Plaintiff that he would talk to Lyon about her complaints." *Id.* ¶ 55.  Plaintiff also complained to two Human Resources representatives about Model N's alleged discriminatory conduct.  *See id.* ¶¶ 70-74.  Finally, Plaintiff alleges that Defendant failed to investigate her complaints of sex discrimination or take any remedial or corrective action in response.  *Id.* ¶ 100.

On or about February 15, 2022, Plaintiff resigned from her employment with Defendant, effective March 1, 2022.  *Id.* ¶ 94.  Plaintiff alleges that a female manager told her that Lyon "did not want women in Vice President of Leadership Team positions at Defendant." *Id.* ¶ 104.

## PROCEDURAL HISTORY

On February 16, 2023, Plaintiff filed her Complaint initiating this action against Defendant, bringing claims of sex discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e) to 2000e-17 ("Title VII") (Count I), *id.* ¶¶ 112-117, and the New Jersey Law Against Discrimination, N.J.S.A. §§ 10:5-1 to 10:5-50 (Count II), *id.* ¶¶ 118-123.  On April 24, 2023, Defendant answered the Complaint.  *See* ECF No. 5.  The Court then entered a case management schedule, and the case proceeded into discovery.  *See* ECF No. 9.  During fact discovery, Defendant took Plaintiff's deposition, and Plaintiff took the depositions of the following individuals: Maria Cammarosano, former Contract Human Resources Business Partner; Sophia Dorry, Senior Human Resources Business Partner; Chris Lyon, SVP and CRO; Brian Mullen, SVP

3

and former VP of Strategic Accounts; Laura Selig, Chief People Officer; Melanie Warfel, VP of Europe and the Middle East; and Karen Zbyszinski, former VP of Net New Sales. *See* ECF No. 32-3, Declaration of Tatiana Webb, Esquire ("Webb Decl.") ¶¶ 2-10. Plaintiff requested the depositions of VP Benjamin Loeffler-Little and Patricia Callahan, SVP of Professional Services, but later withdrew both requests. *Id.* ¶ 11.

On November 22, 2023, Plaintiff issued a Notice of Videotaped Zoom Deposition for CEO Blessing. *See* Webb Decl., Ex. 2 (Blessing Deposition Notice). During a November 27, 2023 status conference with the Court, counsel discussed their disagreement concerning the propriety of CEO Blessing's deposition. The Court ordered the parties to "meet and confer about production of a declaration from [CEO Blessing] in lieu of a deposition. If the parties cannot reach an agreement, Defendant shall file a motion to quash no later than December 22, 2023." ECF No. 28 (Amended Scheduling Order) ¶ 3. Counsel conferred but were unable to reach an agreement. *See* ECF No. 32-1, Defendant's Brief ("Def.'s Br."), at 2.

On December 22, 2023, Defendant filed the present motion, seeking a protective order and/or to quash Plaintiff's notice of CEO Blessing's deposition. *See* Def.'s Motion. On January 22, 2024, Plaintiff filed her brief in opposition. *See* Pl.'s Opp. On January 29, 2024, Defendant filed its reply brief. *See* Def.'s Reply. Having been fully briefed, the motion is now ripe for disposition.

## **LEGAL STANDARD**

Under Federal Rule of Civil Procedure 26(b)(1), a party may only obtain discovery that is relevant and proportional to the needs of a case. Defendant now moves for a protective order precluding CEO Blessing's deposition. The parties do not dispute that CEO Blessing is a high-

ranking corporate executive (*i.e.*, an apex officer) and thus, the "apex doctrine" guides the Court's analysis.

The apex doctrine is "an analytical framework used by courts in assessing whether to permit the depositions of individuals at the 'apex' of corporations and other entities." *U.S. ex rel. Galmines v. Novartis Pharms. Corp.*, No. 06-3213, 2015 WL 4973626, at *1 (E.D. Pa. Aug. 20, 2015). "The doctrine recognizes that depositions of high-level officers severely burdens those officers and the entities they represent, and that adversaries might use this severe burden to their unfair advantage." *Id.* (citation omitted); *cf. Minter v. Wells Fargo Bank, N.A.*, 258 F.R.D. 118, 127 (D. Md. 2009) (noting that the apex doctrine protects an official "whose only connection with the matter is the fact that he is the CEO of the defendant, the top official, where the buck stops on all corporate matters regardless of the level of factual involvement or knowledge"). However, "[t]he apex doctrine is merely a tool for guiding the [c]ourt's analysis in determining whether to limit discovery under Rule 26(b)(2)(C) because the discovery can be obtained from some other source that is more convenient, less burdensome, or less expensive." *In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, No. 19-2875, 2021 WL 6111769, at *3 (D.N.J. June 22, 2021) (quoting *Galmines*, 2015 WL 4973626, at *2), *aff'd*, 2021 WL 6111783 (D.N.J. Aug. 10, 2021). The doctrine gives rise to "a rebuttable presumption that a high-level official's deposition represents a significant burden upon the deponent and that this burden is undue absent the two factors set forth in the apex doctrine." *Galmines*, 2015 WL 4973626, at *2 (citation omitted); *see also Harapeti v. CBS Television Stations Inc.*, No. 21-15675, 2021 WL 8316391, at *2 (D.N.J. Dec. 1, 2021) (noting that the apex doctrine "applies a 'rebuttable presumption'"), *R.& R. adopted*, 2021 WL 8316385 (D.N.J. Dec. 17, 2021).

5

Whether an apex deposition should proceed is within the court's discretion and requires a fact-sensitive analysis. *Valsartan*, 2021 WL 6111769, at *2 (citation omitted). For instance, "where the subject matter of the deposition would involve merely the company's 'day to day operations' or something manifestly immaterial in view of the total scope of the company's overall operations . . . such facts might . . . tend to favor the application of the 'Apex Doctrine' to preclude the requested deposition." *Id.* (quoting *In re Lincoln Nat'l COI Litig.*, No. 16-6605, 2019 WL 7581176, at *2 (E.D. Pa. Dec. 5, 2019)). In contrast, "[f]ederal courts have permitted the depositions of high level executives when conduct and knowledge at the highest corporate levels of the defendant are relevant in the case." *Ciarrocchi v. Unum Grp.*, No. 08-1704, 2009 WL 10676631, at *3 (D.N.J. Aug. 27, 2009) (quoting *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 205 F.R.D. 535, 536 (S.D. Ind. 2002)).

When faced with a request for an apex deposition, a company may invoke the protections of Rule 26(c), which provides that "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." The moving party "must show good cause by demonstrating a particular need for protection," *Cipollone v. Liggett Grp., Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986), and "that disclosure will cause a clearly defined and serious injury. Broad allegations of harm, unsubstantiated by specific examples, however, will not suffice," *Glenmede Tr. Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995) (citing *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994)).

## **DISCUSSION**

In support of its motion, Defendant argues that the apex doctrine precludes CEO Blessing's deposition because he lacks "personal [or] unique knowledge of the issues being litigated in Plaintiff's lawsuit, and the information sought can be obtained from lower-level employees or

6

through less burdensome means." Def.'s Br. at 7.  Defendant contends that Plaintiff's notice to depose CEO Blessing is "nothing more than a fishing expedition," because Blessing did not directly supervise Plaintiff; he did not make the decision to promote Plaintiff to a Regional Sales Director; and he did not learn about Plaintiff's discrimination complaints until after Plaintiff filed her EEOC charge—months after Plaintiff resigned. *Id.* at 7-8.  Accordingly, Defendant asks the Court to grant its motion and enter a protective order precluding Plaintiff from deposing CEO Blessing.

In her opposition, Plaintiff argues that "discovery has yielded voluminous evidence that [CEO Blessing] is a critical fact witness with substantial first-hand, personal knowledge of areas relevant to Plaintiff's claims and of facts that are in dispute," which "cannot be obtained through other employees." Pl.'s Opp. at 2.  Plaintiff notes that CEO Blessing is mentioned "as many as sixty" times in Plaintiff's deposition and "approximately thirty" times in SVP and CRO Lyon's deposition. *Id.*  More specifically, Plaintiff relies on her own testimony to establish that CEO Blessing knew Plaintiff "wanted a leadership position."  ECF No. 35-2, Declaration of Katherine C. Oeltjen, Esquire ("Oeltjen Decl."), Ex. A (Jessen Deposition Transcript ("Jessen Dep.")) 20:6-9.  Plaintiff also points to her own testimony regarding a conversation she had with both CEO Blessing and SVP and CRO Lyon during a work trip in Mexico. *See id.*, Ex. A, Jessen Dep. 53:14-54:24.  Blessing and Lyon discussed with Plaintiff "the future of [Defendant]," and some potential future advancement opportunities. *Id.*, Ex. A, Jessen Dep. 53:14-54:24; Oeltjen Decl., Ex. B (Lyon Deposition Transcript ("Lyon Dep.")) 105:22-110:9.

In addition, Plaintiff relies on her own testimony regarding an incident in which CEO Blessing initially disseminated shirts with the motivational acronym "LFG," only to several male employees. *Id.*, Ex. A, Jessen Dep. 81:9-82:5; Pl.'s Opp. at 3.  Plaintiff states that CEO Blessing

7

was "solely responsible for the LFG shirts and the distribution to male employees" but acknowledges that eventually women—including Plaintiff—also received LFG shirts. Oeltjen Decl., Ex. B, Lyon Dep. 57:5-58:2. Plaintiff also seeks Blessing's deposition because he was involved in the hiring of SVP Lyon, whose conduct is at issue in this case. Pl.'s Opp at 3.

Lastly, Plaintiff asserts that Plaintiff and CEO Blessing "communicated often." *Id.* at 4. In particular, Plaintiff relies on two communications from Blessing to Plaintiff. *Id.* The first is an email in which Blessing congratulates Plaintiff on her promotion to Regional Sales Director. *See* Oeltjen Decl., Ex. A, Jessen Dep. 205:3-7; 390:20-391:12; Webb Decl., Ex. 4, Jessen Dep., Dep. Ex. 7. The second communication is a handwritten note, in which Blessing congratulated Plaintiff on landing an important deal and sent her an LFG t-shirt. *See* Oeltjen Decl., Ex. A, Jessen Dep. 389:9-390:19; Webb Decl., Ex. 4, Jessen Dep., Dep. Ex. 27. Given this evidence of CEO Blessing's connection to Plaintiff and her claims, Plaintiff asks the Court to deny Defendant's Motion.

In reply, Defendant argues that Plaintiff's evidence does not rebut the apex presumption. First, Defendant argues that Plaintiff has not shown that CEO Blessing has superior or unique knowledge of Plaintiff's claims. *See* Def.'s Reply at 1-6. For example, Defendant argues that the majority of references to CEO Blessing in Plaintiff's and Lyon's deposition transcripts are "trivial" and wholly unrelated to Plaintiff's claims of discrimination or retaliation. *Id.* at 2. Defendant underscores that Blessing was not involved in Plaintiff's promotion, and that the one conversation they had was about "leadership opportunities"—not promotions. *Id.* at 4. Defendant also argues that the LFG t-shirt incident and Blessing's hiring of Lyon are irrelevant to Plaintiff's discrete discrimination and retaliations claims. *Id.* at 4-5. Second, Defendant argues that the information Plaintiff seeks from CEO Blessing can be obtained through less burdensome means. *Id.* at 6-9.

For example, other lower-level Model N employees have been deposed, and they have provided information about Plaintiff's claims. *Id.* at 7-8. Further, Defendant notes that Plaintiff cancelled the depositions of VPs Loeffler-Little and Callahan, "both of whom [would] have knowledge of Plaintiff's claims." *Id.* at 8.

Courts in this circuit consider two factors when applying the apex doctrine to determine whether a deposition is warranted: "(1) whether the executive or top-level employee has personal or unique knowledge on relevant subject matters; and (2) whether the information sought can be obtained from lower-level employees or through less burdensome means, such as interrogatories." *Younes v. 7-Eleven, Inc.*, Nos. 13-3500, 13-3715, 13-4578, 2015 WL 12844446, at *2 (D.N.J. Aug. 19, 2015) (quoting *Ford Motor Co. v. Edgewood Props., Inc.*, No. 06-1278, 2011 WL 2517133, at *3 (D.N.J. June 23, 2011)).

A.  **Personal or Unique Knowledge**

To justify the deposition of a senior executive, the party seeking the deposition must demonstrate that the executive in question was "an active participant in the matters at the core of th[e] case." *Valsartan*, 2021 WL 6111769, at *3. Unsubstantiated allegations that an executive would have unique knowledge are grounds to bar such a deposition. *See Ciarrocchi*, 2009 WL 10676631, at *3; *see also Galmines*, 2015 WL 4973626, at *2 (granting a motion to quash the deposition of an executive based on "generic assertions" of the executive's connection to the subject matter of the case based on a PowerPoint presentation and email).

The Court finds two cases instructive on this point. In *Harapeti v. CBS Television Stations Inc.*, a plaintiff alleging sex discrimination at a Miami-based television station sought to depose the former president of the CBS Television Stations business unit within ViacomCBS. 2021 WL 8316391, at *1. In analyzing the first prong of the apex doctrine, the court noted that plaintiff's

9

evidence failed to contradict the executive's "disclaimer of any personal or unique knowledge," and that the plaintiff herself "testified that she does not know whether [the executive] 'specifically was involved in any employment decision related to [her] at [the station].'" *Id.* at *3 (citation omitted). Accordingly, the court found no evidence that the executive had personal or unique knowledge of the plaintiff's allegations. *Id.* Similarly, in *George v. Pennsylvania Turnpike Commission*, the employee plaintiff sought to depose his employer's CEO in connection with the employee's discrimination complaint. No. 18-766, 2020 WL 2745724, at *1 (M.D. Pa. May 27, 2020). Although the court found that the CEO "had some familiarity" with the plaintiff's allegedly discriminatory firing, it found that the CEO had "inferior" knowledge of the relevant events when compared to "the actual decision-maker," who had already been deposed. *Id.* at 3.

For similar reasons, the Court rejects Plaintiff's arguments on this prong. At her deposition, Plaintiff testified:

> Q. And who do you feel subjected you to sex discrimination?
> A. All of them.
> Q. So H.R.?
> A. Yes.
> Q. Jason Blessing?
> A. Uh-hmm.
> Q. Chris Lyon?
> A. Uh-hmm.
> Q. Brian Mullen?
> A. I believe, to be fair, I believe that Brian heard my claims, and I believe H.R. heard some of my claims and went to Chris. And I don't know how involved Jason was.
> Q. Do you believe Chris [Lyon] is the main person who discriminated against you?
> MS. GURMANKIN: Objection to form. You can answer.
> THE WITNESS: Yes.

Oeltjen Decl., Ex. A, Jessen Dep. 84:16-85:11. Like the *Harapeti* plaintiff, Plaintiff here appears unsure of what involvement CEO Blessing had in the alleged discrimination.

10

Moreover, SVP and CRO Lyon's deposition testimony corroborates that CEO Blessing was not involved in the decision to promote Plaintiff:

> Q. Okay. Who made the decision to promote [Plaintiff] into a regional director position?
> A. It was a combination of her direct manager at the time and myself.
> Q. So you and [VP] Brian Mullen?
> A. Yes.

Def.'s Br., Ex. 5, Lyon Dep. 159:6-11. As in *George*, Lyon—the key decision-maker in the alleged discriminatory conduct—has personal and unique knowledge of the relevant events that is superior to CEO Blessing's knowledge. Lyon and VP Mullen—lower-level employees in Plaintiff's chain of command—have already been deposed.

Furthermore, the Court finds Plaintiff's other arguments unpersuasive. For instance, Plaintiff points to the conversation she had regarding leadership opportunities with CEO Blessing and SVP and CRO Lyon on the Mexico work trip, *see* Oeltjen Decl., Ex. A, Jessen Dep. 53:14-54:24, but Plaintiff has already deposed Lyon regarding that same conversation, negating her argument that Blessing has unique knowledge of the event, *see id.*, Ex. B, Lyon Dep. 105:22-110:9. In addition, the Court fails to see how Blessing's distribution of the LFG t-shirts is evidence of his specific knowledge of Plaintiff's claims. *See id.*, Ex. A, Jessen Dep. 81:9-82:5; Pl.'s Opp. at 3. Lastly, the Court is unpersuaded by Plaintiff's argument that Blessing's deposition is necessary because he was involved in the hiring of SVP Lyon, whose conduct is at issue in this case. Pl.'s Opp at 3. Plaintiff's argument concedes the crucial fact that it is *Lyon's* conduct—not Blessing's—at the core of her allegations. And the Court agrees with Defendant that Blessing's involvement in the hiring of Lyon is irrelevant to Plaintiff's claims. Given the record before the Court, the Court finds no evidence that CEO Blessing was the decision-maker in Plaintiff's promotion or that he had any knowledge of any of Plaintiff's complaints while Plaintiff was employed at Defendant.

11

Although Blessing appears to have been familiar with Plaintiff's work, that alone cannot justify his deposition under the apex doctrine, which demands more. Under these circumstances, the Court finds that CEO Blessing lacks any personal or unique information regarding the key allegations in Plaintiff's Complaint.

### B. Obtainable by Other Means

When information a plaintiff seeks "could have been obtained from other available witnesses," they "will not be permitted to depose [the] highest ranking executives" in an organization. *Younes*, 2015 WL 12844446, at *2-3; *see George*, 2020 WL 2745724, at *3 ("The fact that others possess knowledge of these events which would appear to be more detailed than [the executive], in turn, reveals that this information can and has been obtained in a less burdensome way, such as through lower-level employees or other discovery methods.").

Here, the information regarding Plaintiff's promotion and her complaints regarding disparate treatment has already been obtained in a less burdensome way, through the depositions of both key decision-makers in Plaintiff's promotion: SVP and CRO Lyon and VP Mullen. At Lyon's deposition, he was also able to elaborate on the conversation with Blessing and Plaintiff in Mexico regarding potential future leadership opportunities for Plaintiff. Moreover, the Court finds Plaintiff's decision to cancel the depositions of VP Loeffler-Little and SVP Callahan may have contributed to Plaintiff's need for Blessing's deposition. Indeed, Loeffler-Little and Callahan have knowledge of Plaintiff's claims. *See* Def.'s Reply at 8. For example, Defendant represents that Loeffler-Little was responsible for drafting compensation and commission plans and discussed with Plaintiff her compensation plan for the Regional Sales Director role—a representation Plaintiff does not dispute. *See id.* And Plaintiff testified that she complained to SVP Callahan regarding sex discrimination while employed at Model N. Oeltjen Decl., Ex. A, Jessen Dep. 381:7-

382:10. These lower-level executives may possess the very information Plaintiff now seeks from CEO Blessing. Accordingly, the Court concludes that Plaintiff has failed to establish that the information she seeks from CEO Blessing is unavailable through less burdensome means.

On balance, both prongs of the apex doctrine weigh against allowing CEO Blessing's deposition to proceed. Accordingly, the Court **GRANTS** Defendant's motion for a protective order and precludes the deposition of CEO Blessing.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion for a protective order and/or to quash the notice of Jason Blessing's deposition is **GRANTED**. An appropriate Order shall follow.

s/Elizabeth A. Pascal<br>
ELIZABETH A. PASCAL<br>
United States Magistrate Judge

cc:   Hon. Karen M. Williams, U.S.D.J.